Good morning, Your Honors. Chago Cole on behalf of the Plaintiff Appellants. I'm going to try to reserve three minutes of my time for rebuttal. Counsel, please be reminded that the time shown on the clock is your total time remaining. Thank you, Your Honor. All right, thank you. May I begin? Yes, please. The question here, does a foreign company that continuously exploits the California markets for its own commercial gain by, one, requiring California residents to submit their personal identifiable information to them, two, requiring California API keys to access California property, three, requiring California money from its customers on an ongoing basis, four, a company that enters into contracts with California citizens, five, a company that enters into contracts with California companies, with servers in California, with contracts in California, six, a company that receives California money from investors, seven, a company that steps into the shoes of California citizens and executes trades on behalf of California citizens while in California, eight, a California that trades California property, i.e., cryptocurrencies, to execute on behalf of California citizens, nine, a company that runs softwares in California for California residents, ten, a company that knows those individuals are California residents, either by IP address or billing address, and 11, when that company promises to comply with California privacy laws and breaches those very same promises. Does that company get away scot-free when it causes harm to California citizens? If we could set aside 5, 6, 9, and 11 and focus on the other facts that you identified, which is context with California customers. Correct. So what is the evidence or what are the allegations in the complaint that established that the defendant was aware that it was dealing with people in California? I mean, they knew it was dealing with people all over the world, but what is the evidence that it was aware that there were customers in California? Yes, Your Honor. So first of all, when in their own privacy policies and their own terms and conditions, they set out a number of facts that state that they collect, for example, they know that there are California residents through the IP address. In fact, I can point, Your Honor, to the record 1SER179, and it specifically states that three commas, I'm going to skip a little bit, automatically determined by your IP address of your device and manually provided by you to three commas when entering billing addresses. If you disagree with this information that was determined automatically, you're obligated to provide us your billing address, given that the software will be used at this location, by entering the address data in the software when proceeding with the payment and by sending us valid proof of this residential address afterwards. So, Your Honor, the allegations in the complaint also include, obviously, that they paid for a plan. That payment itself would require either the IP address to be inserted and provided to them automatically, as well as the payment data sometimes requiring the billing address itself. Because the IP address, as I understand it, is some indication of location, but people can use VPNs, and it doesn't necessarily tell you really where the – What you're saying is that they asked all of the customers for a physical billing address? Not necessarily, Your Honor. If you disagreed on providing some forms of payment, you would have to provide specifically your billing address. But just addressing the IP address issue that you just flagged as well, this was also addressed by the Briskin versus Shopify. In Briskin and Shopify, they claimed that the IP address could potentially narrow to that California area. While it is true some consumers may be using a VPN, we have to understand that some other consumers may not be using a VPN, and then they would have knowledge that they're targeting that market, just as it was in Shopify as well, where IP address was one of the ways that they could tell. But that's not all. Drawing your attention to – Before we leave page 179 SCR, point me to the precise language on that page that you say would identify someone as a California resident. Yeah, it should be – I can pull it up exactly and show you exactly where it is. Because I don't see the exact term that you're referencing. But the language itself should, from my recollection, starts from the very top. I know that there is a little pop-up, so to speak. Well, but you pointed us to one SCR 179. I'm just asking you what the specific language on that page is that you say identify the customer as a California resident. You mean where it shows IP address location is determined automatically? Well, I thought you said – I thought you said when Judge Miller asked you the question about how – what in the record establishes that the company knew these were California residents. You pointed us to one SCR 179, correct? I can show you right now. So if you go to section F, I know it's a little small. Yes. The second sentence actually – It says three commas. The fourth line should start by that is automatically determined by IP address of your device. Do you see that? I see that. But does that mean, then, that the company is aware that it's a California IP address? To me, there's a gap between saying that and actually collecting the information and knowing that it's a California resident. Well, Your Honor, the IP address can be – can show the California address. It may or it may not show it. So I'm asking you, how do you bridge that between asking for that information and actually the company gathering that information to know that it's dealing with a California resident? Your Honor, so I'm going to parse out – and let's ignore the IP address just for now. I think we can understand that there's a possibility that it could identify California residents, but let's ignore that. Okay. Let's look at just the billing address. The billing address, of course, would show California residents, right? And – but that's not all. There is a lot more, and I want to draw the Court's attention to 2ER249. And in 249, it specifically states the categories, of course, of information we collect. This is three commas. And it states the first and last name, e-mail address, phone number, two-step authentication key, social media account information, including your Facebook, financial information, such as billing and mailing address, exchange account username, API key, API secret, IP address, unique device identifiers, geographical data, such as city of your location identified by your IP address. What page is that? This is 2ER249, and it starts at the – after the section that says personal information that we collect, use, and disclose. And that's part of the California privacy right disclosure. Yes. And does three commas have any other privacy rights disclosure for any other state, or is it just California? It's only California, Your Honor, and I think that's a crucial point as well. Because if you was truly not thinking that it was dealing with California residents and instead it was dealing with other people, maybe you wouldn't have focused so much on California. Let me ask this. I think somewhere one of your allegations was that three commas also targeted California investors. That's right. How so? Well, Your Honor, we found articles that they had acquired money from California investors. And so is it your – is there anything more to it than that? Is it your view that the targeting of California investors would give them knowledge that they were dealing with investors from California, or is that unclear? I don't think it's dispositive on that issue, Your Honor. I think that when we're analyzing the jurisdictional analysis, what would be dispositive would be the conduct as well as the claim itself, whether it arises out or relates of the actual claim. And I think that California investors does rise to the level that they know that they have money coming in from California investors for this business. But it would potentially run into a little bit of a problem if you're looking at vacuum only as to that allegation because the claim arises out of or relates to the actual service itself. But I don't think that the court needs to actually go too much into that because in this case, they not only service California residents, as we just discussed, they knew of California residents either through billing address or the other type of information. So it's not random or attenuated. I mean, this is a class action, obviously, but you have a number of named plaintiffs from California. Did you allege that they had provided a California billing address? Your Honor, so it is important to – that's a good question because I think it's slightly confusing with the declarations. In the declarations, they talk about the free plan, but the class is defined as only those who paid for three commas. So there's no free plan for those individuals, right? They're the ones that paid for the plan. So that's a distinguishing fact as to, let's say, someone who never paid and never gave the billing address or they can be somehow identified by the IP address. We're still dealing just with the individuals that actually paid value and money for that transaction. Okay, but for the plaintiffs, the specific named plaintiffs from California who paid, did you – They're all paid customers. Yeah, but did you allege that in paying that they provided a California address? Your Honor, I think we just stated that they paid for the plan. I don't believe that we actually spelled out that the billing address was included in the payment itself, but that's certainly something that we could amend and include if it's required. Counsel, you also said that cryptocurrency is California property. What are the allegations in the complaint that support that statement? Your Honor, I think that's a legal application of the Ninth Circuit precedent. I believe Raymond actually addresses that as well, which is that cryptocurrency is considered to be California intangible property in California. What about the foreign selection clause with Cloudflare? You're making a type of estoppel argument, which I'm not sure I'm persuaded by, but at least is there something to the fact that if 3Commerce has entered into a contract with a California-based company that has a choice of law provision for California and foreign selection clause, how does that help or does it do anything to this overall claim? Yeah, so ignoring the equitable estoppel for now, I'm just focusing personal jurisdictional analysis. The fact that they entered into contracts with a California server, the fact that they had agreed to potentially respond to California laws with that contract, it does go into potentially the express aiming requirements because they are having contacts and conduct of potentially agreeing to be in that state. Just like the privacy policy potentially would also be one of the factors that we would look at. I mean they're express aiming vis-a-vis a company. Why would that necessarily mean that they're wanting to allow themselves to be brought to suit by non-parties? Well, they agreed to that in the contract, right? That's one thing, but that's – and I'm not trying to – Only with CloudFlare. Correct. Yeah. But regardless, they do agree that in some instances it would not be unfair for them to be potentially in California responding to a lawsuit by CloudFlare. Fine. But either way, it shows another conduct that is directed at the market just like the investors are, just like – And I do want to just briefly just point out one important fact. The service itself that's provided by 3Comas, it's important to understand what they do. When you sign up for 3Comas, the service that you're getting is that this bot, a software that is automatically programmed to follow some form of algorithm, it will step into your shoes. So, for example, let's take Judge Miller. Judge Miller is an account that has the California account name, billing address, potentially Social Security, drive license, and his property. That is being traded on his behalf with his name on a daily basis using this bot. So the idea of connection to the forum and contacting the forum and interacting with the forum, that is certainly being done by the trades itself as well. And that is how 3Comas was contracted to provide a service to California residents. And when torts arise out of or relate to that transaction, then it should be understood that they have availed themselves to the forum. And I think that's a very important fact because that is the actual service that they provide. So just like in Keaton where they were providing magazines to every state, they want people from every state, they intend to have people from every state, they have people from every state. For the record, I am neither a California resident nor a crypto investor. For the record, that's the issue. But he could use VPN, so who knows? Yeah, who knows? All right, counsel, you have 27 minutes. I'm going to reserve the rest of my time for a moment. All right, thank you, counsel. We'll give you a couple of minutes. Good morning. May it please the court. Daniel Rockey for 3Comas Technologies OU. So 3Comas is a private limited company that was formed under the laws of Estonia. It has its headquarters and its only operations in Estonia. It develops software for algorithmic trading of cryptocurrency. And consistent with the decentralized nature of the cryptocurrency industry, it has users dispersed across the globe. And because of that, and because it's a relatively small company, it has limited resources, it has deliberately organized its business affairs to prevent precisely what it's being faced with here, which is being dragged into court more than 5,000 miles away from its home base in Estonia. Now, it does this in a number of ways, but principally two of them. It limits the reach of its promotional and marketing activities. It does not market in the U.S. It does not market in California. And it does that on purpose so that it will not be hailed into court in California or Timbuktu or South America. Because of the nature of its business, it has to have some predictability. Mr. Rocky, can I ask, does your position become harder since the Brisket versus Shopify decision? It just seems, as counsel was explaining, the nature of all these different contacts, maybe individually they may not be that much, but collectively they start to seem not random and fortuitous, but just different ways of reaching out to the California jurisdiction. Thank you for the question. I will concede that when the decision came out two days before our brief was due, my heart skipped a beat, and I thought maybe it would impact it, but in fact it doesn't impact it at all. First of all, Brisket involved an intentional tort, and so the framework there was purposeful direction. But our case law has recognized in numerous places that we can look at purposeful direction or purposeful availment. We look at it holistically. Correct. But I think that's important because it's an intentional tort versus what is alleged here, which is negligence. If you look at their claims, there's negligence, and all the claims sound in negligence. The allegation is that three commas failed to enact reasonable security measures, so there was no intentional act causing an impact within California. Counsel, do you agree with opposing counsel that as a matter of law, cryptocurrency is California property? That is not an issue that's been briefed, and I haven't looked at that issue, and I don't think it's relevant here. Well, if I think it's relevant, what do you think about that statement that cryptocurrency is, but as a matter of law, California property, which would mean that your company is dealing in California property? So what's your position on that? Well, I think you would have to look. I'm not aware of what authority he's citing for that. Okay, that's fair. But I would say as a general matter, if that's the case, then it would depend on where the cryptocurrency is being stored. You'd have to look at where the exchange is that the currency is being stored. And just as a general matter, I would take issue with that, because the whole purpose of the cryptocurrency industry is that it's decentralized, it's largely anonymous. So I would take issue with that proposition, but again, I don't know what authority he's citing for that. I don't think this is in the complaint in its current form, or at least not very clearly, but suppose they were to amend the complaint, and you had allegations that the named plaintiffs provided a billing address in California, and some further allegations that some number of other members of the class did the same. Would that be sufficient? I don't think it would be, but I think... And why not? First of all, we can look at the record to see what information it actually collects. So appellants appointed to the privacy policy, which like most privacy policies, was designed to cover any possibility, any data that they might collect. It does not mean that they actually collected it, either in this instance or in any instance. But if you look to the declaration of Hannah Yancey... Can I stop you with... I mean, the website says personal information we collect. It's not saying that we may collect. It's saying that we collect, use, and disclose. Correct, Your Honor. But if you look at... So there actually is testimony on this. Okay. And if you look to the declaration of Anna Yancey, the chief legal officer, she explained that, in fact, three commas does not collect personal information from its users. The only thing it requires is a working email address and some form of payment mechanism. There's nothing in the record to suggest that in order to provide a payment mechanism, you have to provide your complete address. Certainly we're all familiar with the fact that you may have to provide a zip code. But that's the only information that three commas requires. Now, you can sign up through your Facebook account or a Google account. And so there might be some information that theoretically would be accessible through that. But as a general matter, it requires only an email address and a payment mechanism. And the consequence of that is, in most cases, three commas doesn't even know the actual identity of its users. And it doesn't much care. I'm still not sure you've answered the question. If they could allege that some non-trivial fraction of the plaintiffs provided a zip code which does identify the state, why wouldn't that be enough to show purposeful availment of entering into relationships with people that you know are in California? Right. So it wouldn't matter at all because three commas has done nothing deliberately to solicit that business. It's undisputed in the record that three commas did not target any marketing to California or even to the U.S. generally. That it was appellants who reached out to three commas in Estonia and created an account. In the absence of evidence, some purposeful deliberate action by three commas to cultivate business in California, the fact that some users found three commas in Estonia and created accounts is insufficient to establish. And here's where maybe, I mean, you can tell me what you think about Briskin. I mean, I take the point that Briskin is an intentional tort case. But nonetheless, it seems to reject the idea that you need to be doing something specially focused on the jurisdiction.  So if you're dealing with people everywhere but you know that here is somebody signing up and they're giving me a zip code that identifies them as a California resident and I am nonetheless choosing to provide the service to them, why isn't that insufficient? Well, because I think we have to look at the facts in Briskin, right? So the facts there and the allegations, I think Shopify conceded this, was that they knew at the time when they surreptitiously downloaded software onto Briskin's browser that he was located in California. So even though Briskin represented sort of a sea change in terms of like getting rid of differential targeting, it still, it affirms that there must be purposeful action aimed at the forum, right? In that case, it was Shopify knew that Briskin was in California. It intentionally downloaded files onto his browser secretly and then it extracted data from his computer. And in fact, if you step back, it's really just a straightforward application of purposeful direction analysis. And in fact, the court actually analogized to a real world situation, right? Like an intruder entering California to break into somebody's house to remove files. That's a very different situation from what we have here where 3 Commas has done nothing to solicit business in California. There's nothing in the record to show that 3 Commas knew or even cared where the appellants were located, whether it was California, U.S., Great Britain, could have been anywhere. What if the company knows that cryptocurrency is a very California-centric type industry? Like the entertainment industry. And it's contracted with CloudFlare, a California-based company, and has a forum selection clause, choice of law provisions. Aren't all those purposeful in terms of reaching into the forum and trying to get the benefits of California law and protection? I don't think so. I mean, first of all, I don't think it's fair. And there's certainly nothing in the record to say that cryptocurrency is unique to California. It's a worldwide phenomenon. In fact, most of the major exchanges are based in Hong Kong or elsewhere. So I think as a factual matter, that's not actually accurate. Secondly, if that were the case, then any company in the cryptocurrency industry would be able to be hailed into court, regardless of whether they have arranged their affairs to not even sell to people in California, for example. And as I started out here, I think it's really important to note that one of the ways that 3 Commas attempted to obtain predictability and to prevent being dragged into court thousands of miles away is that before you can access its service, this is every user, you have to affirmatively agree to its terms of use. And those terms of use have a forum selection clause requiring all disputes to be resolved in Estonia under Estonian law. And so the appellants here, and there's a declaration in the record establishing it with screenshots of what they saw, exactly the terms that they agreed to, and they expressly agreed. Isn't the overarching inquiry whether or not it would be constitutionally fair to have this company held, H-A-L-E-D, into court in California? Isn't that really what we're trying to determine as a matter of constitutional due process? Absolutely, Your Honor. So the difficulty I'm having is if this company has voluntarily agreed to be held into California court, at least with one company, why would it be constitutionally unfair to require them to come to California for a different company? That's kind of a disconnect for me. Yeah, good question, Your Honor. So fairness and due process looks at sort of predictability, right? Is it foreseeable that you might be hailed into court thousands of miles away? Now, the fact that 3Com has utilized the services of Cloudflare for services totally unrelated to the client. Not only used the services but agreed that any disputes could be resolved in California, which is kind of an indication that California is a forum that it has allowed itself to be hailed into. Well, so first of all, I think we need to step back. So California is obviously the home to many technology companies. So under that theory, all 3 billion users of Facebook could be hailed into court for any reason whatsoever. No, because they've specifically agreed in the contract. Well, right. Facebook users agreed to Meta's terms of use, which have a forum selection clause in California. Well, that's a case for another day. We're talking about this case today and this contract. Right. So 3Com has agreed that if there's a dispute with Cloudflare, then it could be subject to jurisdiction in California. But there are many cases, in fact, Boschetto v. Hansen, they all say that that alone, so agreement or consenting to jurisdiction as to one set of disputes, as to one party, is not an all-purpose consent to jurisdiction for all purposes or for any comers, right? This is a little bit related, though. I mean, I see your argument if it's, you know, a contract with a moving company and then you have a contract to build a restaurant. Those are two different things. But these are all related, don't you think? No, I don't, Your Honor. Oh, you don't? It's in the record. But 3Com retains Cloudflare like thousands, perhaps tens of thousands of companies around the world, to provide three discrete services. One of them is DNS lookup. All that does is translate, like, the words URL into an IP address so that it can find the site. It uses bot detection services, which is like the reCAPTCHA we all know proved that you're not a computer. And then it has CDN services, which, as Anna Janssen explains in her declaration, all that does is allow it to take advantage of Cloudflare's network of servers all around the world. So it in no way facilitates the services that are provided to the plaintiffs in this case? Well, it facilitates it only in the sense that it's part of a website service, right? And they access the software through the service. But it has nothing to do with the claims. It has nothing to do with any of the alleged acts here, which all occurred in Estonia. Can I ask about the CDN piece of this? CDN, I think denial of services. Is that what that is? It's a security measure of a service? That's the bot detection services.   And plaintiffs' allegations are, I believe, that three commas was not protective enough against a hacker attack or some sort of penetration into the system in order to have unauthorized trades. Why isn't there a connection between using Cloudflare for some type of security protection measure and plaintiffs' claim? Because, as we explained in our briefing, and I believe in the declaration, bot detection services are targeted at an entirely different issue. That's attempting to prevent distributed denial of service attacks, which are attacks that shut down your website. They're not attacks that extract data, cause a data breach. It's just the act of using thousands of computers at one time to flood the website with requests and then cause it to shut down. And it has nothing to do with hacking, and so you think they're totally dissimilar? It has nothing to do with hacking at all, Your Honor. Okay. So in closing, I would just say that if three commas can be hailed into court here, then really there's no way that any company anywhere in the world that could prevent itself from being hailed into could organize its affairs in a way that it's not going to be hailed into court thousands of miles away to defend suits. The appellants here expressly agreed that they would resolve any disputes with three commas in Estonia under Estonian law. And three commas, there's nothing in the record to show that three commas in any way expressly aimed any of its conduct at California. Thank you, counsel. Thank you. Let's have two minutes for rebuttal. Your Honor, I appreciate those two minutes. My colleague just now mentioned that a cryptocurrency potentially would be property wherever it's being stored. That is not true. You have to pay taxes for cryptocurrency. The law has changed over the last ten years where it is found to be intangible property by someone who has a legal right to that property. So just as much as if you're driving a vehicle and you go to New York for the weekend, that doesn't make it automatically that that vehicle is now a New York property. That is, you're a California resident who purchased a vehicle in California. Therefore, it's your property in California. And if Your Honors want a one-paragraph supplemental briefing with only case law that shows this under the Ninth Circuit, I'm happy to provide that as well. What was the case that you cited for the proposition that cryptocurrency is, as a matter of law, a California property? Your Honor, I cited Bremen, but I don't have the full cite because he wasn't briefed. Well, that's the point. I was going to ask you, did you put this in your brief? So if you didn't put this in your brief, is it fair for us to consider it now? Well, Your Honor, I think it's fair for you to know that we did say cryptocurrency. And as a matter of law, if Your Honor looks, cryptocurrency is California property, or it is property, intangible property, that is legally recognized by California laws as well as in the Ninth Circuit. And then just briefly, counsel mentioned that Briskin doesn't really affect the analysis, but Briskin overruled differential targeting. If we were under differential targeting, you would potentially see that they were not differentially targeting California because they are a nationwide or a global-wide website. However, just like, for example, Horbo Brands, it was selling products on Amazon. And Amazon went and shipped the product to a specific forum. That was enough for the contact. He also mentioned that there is no intentionality alleged in the complaint. That is not true. We mentioned throughout the complaint several times that they intentionally violated and recklessly disregarded plaintiffs' and class members' rights. They knew and should have known that he had not implemented reasonable security standards. So intentionality and intentional acts were actually alleged. Finally, for Cloudflare, we do allege that Cloudflare was actually the one transmitting the information. There are screenshots of all the complaints, starting on paragraph 22 to paragraph 37 or so, that that information, the API keys, the private information, is actually unencrypted. So anyone could potentially grab that transmission and breach or hack the individuals. They claim they have nothing to do with that. They don't know how the hack happened. They have no idea. At the end of the day, for example, Mr. Freeman put his life savings into that account, and that life savings was taken and stolen because 3Comas decided to not do their due diligence. And in response, they say you cannot sue us anywhere in the United States because there is no specific jurisdiction or general jurisdiction anywhere. Your Honor, I don't believe that fair play and substantial justice means that. They are okay taking California people's money. They're okay taking California investors. They're okay saying and marketing to the global world that they follow California laws. They are just not okay with the California laws. Counsel, what's your response to opposing counsel's emphasis on the fact that they all signed, as part of the user agreements, they agreed to resolve any disputes in Estonia? Your Honor, that would be, that's not something that's up in the dispute right now. It would be a foreign nonconvenience argument. But B.S. Bremen and his progeny is the one that deals with that argument. I think the district court would be capable of following the Ninth Circuit directive on how to analyze that fact. And the spoiler is that typically California views those clauses as unenforceable because there is a strong California privacy interest in California, especially when you breach California laws. And the last point that I just want to make, during our arguments for Briskin, one of the questions asked by Judge Freeland was, what if this company just took the information and they just misused or they were hacked? Would that not be enough for personal jurisdiction? And I'll leave that to your honors, I believe it is. All right. Thank you, counsel. Thank you. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court.
judges: RAWLINSON, MILLER, SANCHEZ